UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SINACA TIMES,

      Petitioner,

                                 CASE NO. 2:12-CV-15550

v.                             JUDGE BERNARD A. FRIEDMAN
                                 MAGISTRATE JUDGE PAUL J. KOMIVES

JEFFREY WOODS,

      Respondent.

_____/


## REPORT AND RECOMMENDATION


*Table of Contents*

| | | | |
|---|---|---|---|---|
| I. | RECOMMENDATION | | | 2 |
| II. | REPORT | | | 2 |
| | A. | *Procedural History* | | 2 |
| | B. | *Factual Background Underlying Petitioner's Conviction* | | 5 |
| | C. | *Procedural Default* | | 9 |
| | D. | *Standard of Review* | | 13 |
| | E. | *Jury Instructions (Claim I)* | | 16 |
| | F. | *Felony Murder Conviction (Claim II)* | | 19 |
| | | 1. | *Overcharging* | 19 |
| | | 2. | *Sufficiency of the Evidence* | 20 |
| | | | a. Legal Standard | 20 |
| | | | b. Analysis | 22 |
| | G. | *Double Jeopardy (Claim III)* | | 27 |
| | | 1. | *Legal Standard* | 27 |
| | | 2. | *Analysis* | 29 |
| | H. | *Ineffective Assistance of Counsel (Claim IV)* | | 33 |
| | | 1. | *Legal Standard* | 33 |
| | | 2. | *Analysis* | 35 |
| | I. | *Recommendation Regarding Certificate of Appealability* | | 36 |
| | | 1. | *Legal Standard* | 36 |
| | | 2. | *Analysis* | 37 |
| | J. | *Conclusion* | | 38 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | | | 38 |

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Sinaca Times is a state prisoner, currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan.

        2.      On August 29, 2006, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316(b); armed robbery, MICH. COMP. LAWS § 750.529; first degree home invasion, MICH. COMP. LAWS § 750.110a(2); possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f, and four counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Bay County Circuit Court.  On October 30, 2006, he was sentenced as a fourth habitual offender to a mandatory term of life imprisonment without possibility of parole on the murder conviction and concurrent terms of life imprisonment on the robbery, home invasion, and felon-in-possession convictions, all consecutive to concurrent terms of two years' imprisonment on each felony-firearm conviction.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      DEFENDANT-APPELLANT WAS DENIED DUE PROCESS OF LAW BY THE USE OF SUGGESTIVE PHOTO IDENTIFICATION PROCEDURES. US CONST AM XIV.

        II.     THE TRIAL COURT ERRONEOUSLY DENIED A DEFENSE REQUEST FOR AN INSTRUCTION ON MANSLAUGHTER OR SECOND DEGREE MURDER WHERE THERE WAS SUFFICIENT EVIDENCE TO SUPPORT SUCH A CONVICTION IN VIOLATION OF DEFENDANT-APPELLANT'S DUE PROCESS RIGHTS.

III.    THE TRIAL COURT VIOLATED DEFENDANT-APPELLANT'S DUE PROCESS RIGHTS BY ADMITTING GRUESOME PHOTOGRAPHS OF THE DECEDENT WHERE THE UNFAIR PREJUDICE SUBSTANTIALLY OUTWEIGHED ANY PROBATIVE VALUE.

IV.    DEFENDANT-APPELLANT SHOULD BE GRANTED A NEW TRIAL BECAUSE THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING CORPORAL UMPHREY TO GIVE OPINION TESTIMONY ON THE SUCCESS RATE OF FINDING FINGERPRINTS SUITABLE FOR IDENTIFICATION.

The court of appeals found no merit to petitioner's claims, and affirmed his convictions and sentences. *See People v. Times*, No. 274209, 2008 WL 2038028 (Mich. Ct. App. May 13, 2008) (per curiam).

4.    Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Times*, 482 Mich. 1033, 757 N.W.2d 114 (2008).

5.    Petitioner subsequently filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.    DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL, EFFECTIVE ASSISTANCE OF COUNSEL, COMPULSORY PROCESS CLAUSE RIGHT TO PRESENT A DEFENSE, AND CONFRONTATION OF WITNESSES WHERE THE TRIAL COURT UPHELD THE PROSECUTOR'S REQUEST TO KEEP A CONFIDENTIAL WITNESS'S IDENTITY SUPPRESSED, AND FAILED TO HOLD THE REQUIRED IN CAMERA HEARING.

II.    DEFENDANT WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE PROSECUTOR WAS PERMITTED TO INTRODUCE EVIDENCE WHICH WAS MORE PREJUDICIAL THAN PROBATIVE CONCERNING DEFENDANT'S NICKNAME OF "LIL' MURDA".

III.    THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INQUIRE INTO DEFENDANT'S REQUEST FOR SUBSTITUTE COUNSEL, WHERE SUBSTITUTE COUNSEL WAS ALSO A

3

PROSECUTOR WHO PROSECUTED DEFENDANT IN 2002, AND THERE WAS A BREAKDOWN IN ATTORNEY CLIENT RELATIONSHIP.

IV.     DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO INQUIRE OF DEFENDANT CONCERNING CRITICAL EVIDENCE THAT DEFENDANT DID NOT HAVE ANY BRUISES, CUTS, ABRASIONS OR MARKS AT THE TIME OF HIS ARREST AND PROCESSING DESPITE A STAR PROSECUTION WITNESS'S TESTIMONY THAT HE THREW A BIKE AND HIT DEFENDANT IN THE HEAD WITH IT.

V.      TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO INVESTIGATE AND PETITION FOR THE APPOINTMENT OF AN EXPERT WITNESS ON THE RELIABILITY OF EYEWITNESS IDENTIFICATION.

VI.     DEFENDANT WAS DEPRIVED OF HIS DUE PROCESS CLAUSE RIGHT TO APPEAL, AND EFFECTIVE ASSISTANCE OF COUNSEL.

On July 28, 2011, the trial court denied petitioner's motion for relief from judgment, concluding that all but petitioner's ineffective assistance of appellate counsel claims were barred by MICH. CT. R. 6.508(D)(3) because petitioner failed to raise the claims on direct appeal. The trial court also rejected each claim on the merits. *See People v. Times*, No. 05-10612-FC (Bay County, Mich., Cir. Ct. July 28, 2011). Petitioner sought leave to appeal the denial of his motion. In addition to the issues raised in his motion for relief from judgment, petitioner filed a supplemental brief in the Michigan Court of Appeals raising four additional claims:

I.      THE TRIAL COURT ABUSED IT'S DISCRETION BY REFUSING MOTION AND INSTRUCTIONS OF MANSLAUGHTER AND, DENIED DEFENDANT'S RIGHT TO A FAIR TRIAL.

II.     THE TRIAL COURT COMMITTED A REVERSIBLE ERROR IN DEFENDANT'S CONVICTION OF FELONY MURDER.

III.    DEFENDANT'S RIGHT OF DOUBLE JEOPARDY WAS VIOLATED.

IV.     DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF BOTH

4

TRIAL AND APPELLATE COUNSEL FOR FAILING TO CHALLENGE
THE OVERCHARGING, AND DOUBLE JEOPARDY VIOLATIONS
UNDER U.S CONST. AMEND. V, VI, AND XIV.

The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for

leave to appeal in standard orders. *See People v. Times*, 493 Mich. 869, 821 N.W.2d 547 (2012);

*People v. Times*, No. 307295 (Mich. Ct. App. Oct. 22, 2012).

6.   Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on December 17, 2012. As grounds for the writ of habeas corpus, he raises the four claims that he

raised in his supplemental brief in connection with his motion for relief from judgment.

7.   Respondent filed his answer on June 6, 2013. He contends that petitioner's second

through fourth claims are barred by petitioner's procedural default in the state courts, and that all

of the claims are without merit.

8.   Petitioner filed a reply to respondent's answer on July 24, 2013.

B.   *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the July 21, 2005, robbery and murder of Ricky Narvaiz.

The evidence adduced at trial is accurately summarized in respondent's answer:

> Times used to date Timothy Keyes' daughter and occasionally stayed at the
> house behind Keyes' house. (8/18/06 Trial Tr. [III] at 43-44.) Times' street name
> was "Little Murda." (III at 60, 63.) Keyes gave Times a bike—the same bike that
> Officer Todd Umphrey found in a crime scene on July 21, 2005. (III at 44-46, 118,
> 120, 122-23.)
> Earlier that night, Shelly Keyes and Times got some pizza and looked at
> some puppies. (III at 49.) Shelly went to sleep; Times woke her up to tell her that he
> and his cousin were going to the 7-Eleven. (III at 50-51.) When Shelly later got up
> and let the puppies out, she noticed that one of the bikes was missing. (III at 52.)
> When she asked Times where it was, he said that he did not know. (III at 52.)
> Ricky Narvaiz, Britney Bailey, and Lakresha Campbell were inside Tasha
> Lopez's apartment on July 21, 2005. (8/17/06 Trial Tr. [II] at 78-79, 91-92; III at 27.)
> Desmonee Childrey, her sister, Champaign Brock, and Kwame Matthews were also
> there. (II at 104, 122, 145.) Rosalind Brock arrived at Lopez's apartment to pick up

her daughters, Champaign and Childrey. (II at 98-99, 105.) Rosalind, Lopez, Champaign, and Childrey went outside because Lopez's children were sleeping. (II at 146; III at 27.) Matthews also went outside; Ricky stayed inside. (II at 123.)

Campbell saw Times walking around behind Tasha's house. Then Times entered the room that Ricky, Bailey, and Campbell were in, pushed them, pulled out a gun, and pointed it at them. (II at 79-80.) Campbell recognized Times because she met him just a few weeks earlier around July 4th when Times told her that his name was "Little Murda." (II at 83-84, 93, 95-96.)

Times told them to give him all of their "stuff." Ricky told Times that he did not have anything, so Times told Ricky to give him what Ricky had in his pockets. (II at 80.) Ricky handed over his cell phone, an ID, and some money. (II at 80.) Then Times told Ricky to get naked. Ricky stripped down to his underwear and socks. (II at 81.) Times told them all to sit on the bed, and told them that he was from the East side of Saginaw. (II at 81.)

After Campbell told Times that she was from Saginaw, Times told her that he would not do anything to her since she was from Saginaw, but that he was going to show those "Bay City niggers" how he gets down. (II at 81.) Ricky told Times that he was not from Bay City either and that he was with Matthews. Times kept repeating "you're with Kwame" and then went outside and called Matthews' name. (II at 81-82.)

While Matthews, Childrey, and Champaign stood by the front door, someone opened the front door and called Matthews' name. (II at 105, 124, 145.) Childrey told Matthews that someone was calling him, and they all went inside. (II at 105, 124, 146.) Childrey saw Times when she opened the door. (II at 106, 114, 115.)

Childrey first met Times a few weeks earlier when her friend called Times over to the porch. (II at 106.) Times told Childrey his name and that he was trying to sell a necklace. (II at 106-07.)

After Childrey saw Times by Lopez's front door, Times and Matthews started fighting. (II at 107, 115, 146.) The lights went out as Matthews walked inside; Matthews felt someone coming toward him, so he grabbed the person's arms. (II at 124.) Matthews felt something metal, and put the person up against the stove. Matthews let the person go when he said he was "Bird" because Bird was Matthews' friend. (II at124.) The person ran past him, and Matthews realized that it was not his friend. (II at 125.) Childrey ran to the bedroom and told Campbell to kick out the window. (II at 107, 118.)

When Campbell heard that Times and Matthews were fighting in the kitchen, Ricky went out to the kitchen, and Campbell and Bailey jumped out the window. (II at 82-83, 147.) As Ricky ran out of the room, Campbell heard Ricky tell Matthews that Times had just robbed him. (II at 86-87.) Matthews heard Ricky say, "The dude just robbed me." (II at 125.) Matthews chased the person out the back patio door, and saw him try to get on a bike. (II at 125.) When he missed the bike, he kicked the bike toward Matthews. (II at 125.)

By the time Campbell and Bailey were out the window, Childrey saw Matthews and Times out near the patio. (II at 107, 108.) Childrey saw Ricky in his

boxers and heard Ricky say that he was robbed when he went out to the back patio. (II at 109-11, 126.)

Campbell and Bailey ran past Ricky, Matthews, and Times. (II at 84.) Campbell stopped, turned, and saw Times pointing a gun at Ricky and Matthews. (II at 85.) Campbell was 12 feet, maybe more, away from them. (II at 96.)

Times had a gun out, pointed it at Matthews' head, and cocked it. (II at 125, 126; III at 28, 37.) Times fired one shot. (II at 126.) Matthews picked up the bike and threw it at Times. (II at 85, 86, 111-12, 125.) Times fired the gun again. (II at 85, 126; III at 39.) Childrey heard shots fired before Matthews threw the bike and did not see the bike hit Times. (II at 119.) Campbell saw Matthews duck and saw Times pick up the bike, jump on it, and ride away toward Vanburen Street. (II at 85, 88.) Campbell screamed because she thought Times shot Matthews. (II at 88.)

Matthews turned around and did not see Ricky, so Matthews went back inside the apartment. (II at 127.) Matthews knew that he had seen Times before, but could not remember where. (II at 130.)

Rosalind heard the shots while she waited outside for her daughters with Lopez. (II at 99.) Lopez ran into the apartment to check on her kids. (III at 31.) Rosalind fell to the ground, jumped back up screaming her daughter's names, and ran to the police department. (II at 99-100.) When she heard the shots, Childrey and her sister, Champaign, went out the front door and ran to the police. (II at 109, 147.) As she ran, Rosalind saw a man with a gun standing in front of the door with a gun. (II at 101.) Rosalind arrived just as a police car pulled out, so she told them what happened. (II at 100; III at 98-99.)

Ricky collapsed in the front parking lot. (II at 127, 148; III at 32.) When Campbell turned again, she saw Ricky laying in the street, so she ran to him. (II at 88.) Matthews stayed inside the apartment because he was on parole and was not supposed to be out that late or drinking. (II at 128.)

Lopez met Times once before in the park. Times passed out concert papers, and Lopez spoke with him. (III at 29.) Lopez did not give Times permission to enter her apartment the night Ricky was shot. (III at 29.) She found Ricky's clothes in her bedroom. (III at 41.)

The next morning, Shelly reported the missing bike to the police, but they could not help her because they were working on a big case. (III at 57-58.) Times and Shelly then went to the courthouse because Times had a court appearance. (III at 54.) Times called his attorney's office from a cell phone, and someone called Times back on that same cell phone. (III at 55-56.)

Pamela Erskine, who worked for Times' attorney, wrote down the number that Times gave her when he called on July 21, 2005. (III at 84-85.) Erskine left a message on the cell phone about Times' hearing being adjourned. (III at 87-92.)

Gilbert Narvaiz was Ricky's first cousin. Ricky borrowed Gilbert's cell phone the night Ricky was killed. (III at 93.) Gilbert called the voicemail the next day from his home phone and heard a strange message. (III at 94.) Gilbert had the police record the message. (III at 94.)

Williams was arrested for the parole violation. (II at 128, 134.) While he was

7

in jail, Williams remembered where he met Times. (II at 130.) Williams knew the shooter was Times because he had seen Times three weeks earlier at his friend's house shooting dice. (II at 128-29.) After about 15 minutes of playing, Times lost his money and left. (II at 129-30.) The police showed Williams a picture of Times, and Williams identified him as the shooter. (II at 131, 132.) Sergeant Potts showed Williams the picture in an effort to eliminate Times as a suspect. (8/22/06 Trial Tr. [IV] at 82, 83-84.)

Campbell and Childrey both identified Times out of a photographic line-up. (IV at 120-21.) The police used a photo line-up because Times refused to participate in a physical line-up. (IV at 122.)

Ricky had a single gunshot wound to his left shoulder and a fresh scrape on his left knee. (III at 15, 18.) The bullet traveled from the left shoulder through Ricky's left lung, his aorta, and his right lung. (III at 16.) Dr. Kanu Virani examined Ricky's body and recovered the bullet from Ricky's right chest cavity. (III at 16, 20.) Ricky died from the gunshot wound. (III at 16.)

Answer, at 9-15; *see also*, Def.-Appellant's Br. on Appeal, in *People v. Times*, No. 274209 (Mich.

Ct. App.), at 9-24. In addition, petitioner's brief in the Michigan Court of Appeals summarizes the

testimony presented on his behalf:

. . . . Juenicka Williams testified that Sinaca Times is her brother. (T.T. Vol 5, pg 15) She testified that she saw Mr. Times July 21, 2005 in Baytown when she and her friend went to purchase marijuana from him. (T.T. Vol 5, pg 15) She testified that while she was talking to Sinaca by a dumpster, they heard gunshots, they talked a few more minutes until they heard police sirens and then they got in their cars and left. (T.T. Vol 5, pg 17) She testified that 2:00 a.m. was the latest she remembered being at Baytown. (T.T. Vol 5, pg 19) She testified that she read in the paper the shooting happened at four or five o'clock in the morning and that she was not with Mr. Times at that time. (T.T. Vol 5 pg 21).

. . . . Sinaca Times testified that the night of July 20, 2005 he was living with Shelly Keyes. He testified that they had gotten pizza and went back to Shelly's house. (T.T. Vol 5, pg 29-30) He testified that he left at around midnight[,] he drove to 7-11 to get some stuff and then came back to the house. (T.T. Vol 5, pg 31) He testified that around 3:00 a.m. he got a call from his sister's friend to buy some marijuana. He testified that he set up the meeting in Baytown and that he drove there. (T.T. Vol 5, pg 32) He testified that after he completed the transaction with his sister, he was walking back to his car and he heard gunshots. (T.T. Vol 5, pg 34) He testified that he could see where the person was shooting and where the people were standing. (T.T. Vol 5, pg 34) He testified that after he heard the shots he talked to Ron for a minute and said he had to get out of there. (T.T. Vol 5, pg 35) He testified that while he was going back to his car, he heard a phone ringing so he looked for it and picked it up. (T.T. Vol 5, pg 35) He testified that a police officer stopped him and talked to

him.  He testified that he told the police officer that "somebody's shootin" [sic] and the officer asked him if he got a glimpse of the shooter.  (T.T. Vol 5, pg 35) He testified that he told the officer somebody just rode off on a bike and the officer told him to go back around the corner and wait for him.  (T.T. Vol 5, pg 35)

Mr. Times testified that the officer he spoke to that night while walking back to his car, was officer Murphy.  (T.T. Vol 5, pg 36) He testified that when he went around the corner to wait, he saw Officer Mays and he ducked down because he had marijuana in his car.  He testified that if Officer Mays saw him, he would search his car so he left the scene and went home.  (T.T. Vol 5, pg 36-37).  Mr. Times testified that he did not shot [sic] at Kwame Matthews and that he did not shoot Ricky Narvaiz.  (T.T. Vol 5, pg 37)

*Id*. at 24-26.

C.    *Procedural Default*

Respondent contends that petitioner's second, third, and fourth claims are procedurally defaulted because petitioner failed to exhaust those claims in the state courts, and is now prevented from doing so.  The Court should agree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must

be clear, consistently applied, and well-established at the time of the petitioner's purported default."). Further, the federal habeas statute provides, in relevant part, that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" 28 U.S.C. § 2254(b)(1)(A). Thus, "[f]ederal habeas relief is available to state prisoners only after they have exhausted their claims in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999). To satisfy the exhaustion requirement, a petitioner "must have 'fairly presented the substance of each of his federal constitutional claims to the state courts.'" *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995)). Further, the petitioner must fairly present the claim at each level of state court review. *See O'Sullivan*, 526 U.S. at 845-47.

In *Coleman v. Thompson*, *supra*, the Supreme Court suggested in dicta that where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." *Coleman*, 501 U.S. at 735 n.*. Although the *Coleman* footnote was dicta, it has subsequently been applied by both the Supreme Court and the Sixth Circuit. *See O'Sullivan*, 526 U.S. at 848; *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Hannah v. Conley*, 49 F.3d 1193, 1195-96 (6th Cir. 1995) (per curiam). Where no further avenues to present a claim exist, the claim is deemed technically exhausted, and the question becomes solely whether the claim is barred by a procedural default. *See Broom v. Mitchell*, 441 F.3d 392, 399-400 (6th Cir. 2006).

Here, petitioner's second through fourth habeas claims were first presented in a supplemental

10

brief in the Michigan Court of Appeals on the appeal from the denial of his motion for relief from judgment. They were never presented to the trial court, and thus were not properly exhausted by being raised at each level of the state review process. *O'Sullivan*, 526 U.S. at 845-47. And because petitioner has already filed a motion for relief from judgment challenging his convictions, he may not bring a second motion raising the unexhausted claim. The Michigan Court Rules explicitly provide that "one and only one motion for relief from judgment may be filed with regard to a conviction." MICH. CT. R. 6.502(G)(1).[1] Thus, there is no further state court avenues of relief available for petitioner to pursue his claims. His claims are therefore technically exhausted, but defaulted. Accordingly, review of petitioner's tenth claim is barred unless petitioner is able to meet one of the two exceptions permitting review of procedurally defaulted claims.

The first exception to the procedural default rule is the cause and prejudice exception. Under this exception, review of an otherwise barred claim is allowed if petitioner is able to demonstrate cause for, and prejudice attributable to, his default. *See Coleman*, 501 U.S. at 750; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). To establish "cause," petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also*, *Coleman*, 501 U.S. at 753. Here, petitioner has not identified, and the state court records do not reveal, any objective factor external to the defense which prevented petitioner or his counsel from raising his claims on direct appeal.

The only arguable basis for cause would be appellate counsel's failure to raise these claims

---

[1]The rule contains an exception for claims based on "a retroactive change in the law" or "new evidence that was not discovered before the first motion." MICH. CT. R. 6.502(G)(2). Petitioner's claims are not based on any new, retroactively applicable law, or on any newly discovered evidence.

on direct appeal.  But while constitutionally ineffective assistance of counsel may constitute cause to excuse a procedural default, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray*, 477 U.S. at 488, appellate counsel's failure to raise petitioner's habeas claims on direct appeal cannot constitute cause here, because petitioner has not properly exhausted any ineffective assistance of appellate counsel claim.  As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause.  *Edwards*, 529 U.S. at 451 (citing *Murray*, 477 U.S. at 488-89).  In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment.  *See id.*  "In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Id.*  For this reason, the ineffective assistance claim which is asserted as cause must itself be both exhausted, *see id.* at 451-52 (discussing *Murray*, 477 U.S. at 489), and not procedurally defaulted, *see id.* at 452-53.  Further, petitioner's default is not in failing to raise these claims on direct appeal, but in his own motion for relief from judgment.  Thus, petitioner cannot establish cause.  Further, as explained in the remainder of this Report, each of petitioner's claims is without merit, and thus petitioner cannot establish prejudice attributable to his default.

Under a second exception, known as the "fundamental miscarriage of justice" exception, petitioner can still have his procedurally barred claims reviewed if he can show that the constitutional errors he alleges "'ha[ve] probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Murray*, 477 U.S. at 496); *accord Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).  "[T]o establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence, it is more likely than not that no reasonable juror

would have convicted him.'" *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (internal quotation omitted)); *accord Kuhlmann*, 477 U.S. at 455 n. 17 (citation omitted). Petitioner does not present any new reliable evidence that he is factually innocent of the charges against him. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995) ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."). Thus, he has failed to establish that application of the procedural bar will result in a miscarriage of justice.

Accordingly, the Court should conclude that petitioner's second, third, and fourth claims are barred by his procedural default in the state courts. Alternatively, for the reasons explained below, the Court should deny the claims on the merits.

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that

14

the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412). The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the

15

decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).[2]

E.      *Jury Instructions (Claim I)*

Petitioner first contends that he was denied a fair trial by the trial court's failure to provide instructions on the lesser offenses of second degree murder and voluntary manslaughter.  The Michigan Court of Appeals rejected this claim on petitioner's direct appeal, concluding that the instructions were not warranted under state law.  The Court should conclude that petitioner is not entitled to habeas relief on this claim, for two reasons.

First, this claim does not present a cognizable basis for habeas review.  Although the Eighth Amendment and the Due Process Clause require that a trial court instruct the jury on lesser included offenses in the context of a capital case, *see Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (trial court required to instruct *sua sponte* on lesser included offenses where the failure to do so would result in the jury being given an "all or nothing" choice of convicting on the capital charge or acquitting the defendant), "the Constitution does not requires a lesser-included offense instruction in non-capital cases."  *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001).  As the Sixth Circuit has noted, even where a lesser offense instruction is requested, the failure of a court to instruct on a lesser included or cognate offense in a non-capital case is generally "not an error of such magnitude to be cognizable in federal habeas corpus review." *Bagby v. Sowders*, 894 F.2d 792, 797

---

[2]Because petitioner's second through fourth claims were not addressed on the merits in the state courts, I do not apply the deferential standard of review set forth in § 2254(d) to those claims.

(6th Cir. 1990) (en banc); *see also*, *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002).  At a minimum, there is no clearly established Supreme Court law which requires the giving of a requested lesser offense instruction in the non-capital context, as is required for habeas relief under § 2254(d)(1).  *See Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir. 2001); *Kuroda v. Bell*, No. 2:07-CV-12310, 2007 WL 1657410, at \*2 (E.D. Mich. June 7, 2007) (Cohn, J.); *Adams v. Smith*, 280 F. Supp. 2d 704, 717 (E.D. Mich. 2003) (Tarnow, J.).

Second, even if otherwise cognizable, petitioner's claim is without merit because he was not entitled to manslaughter instructions as a matter of state law.  Under Michigan law, a defendant is entitled to a lesser offense instruction where both the lesser offense is a necessarily included one and "a rational view of the evidence would support it."  *People v. Cornell*, 466 Mich. 335, 357, 646 N.W.2d 127, 139 (2002).  Specifically, where a defendant is charged with first degree murder an instruction on second degree murder will "be proper if the intent element differentiating the two offenses is disputed and the evidence would support a conviction of second-degree murder."  *Cornell*, 466 Mich. at 358 n.13, 646 N.W.2d at 140 n.13.  Similarly, "when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given *if supported by a rational view of the evidence*."  *People v. Mendoza*, 468 Mich. 527, 541, 664 N.W.2d 685, 693 (2003) (emphasis added).  Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment.  *See* MICH. COMP. LAWS § 750.317.  Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment.  Specifically, under Michigan law, first degree murder includes any "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," MICH. COMP. LAWS § 750.316(1),

17

as well as "[m]urder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b). Also under Michigan law, voluntary "[m]anslaughter is murder without malice." *People v. Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003). "Murder and manslaughter are both homicides and share the element of being intentional killings. However, the element of provocation . . . characterizes the offense of manslaughter [and] separates it from murder." *People v. Pouncey*, 437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991). Thus, "[u]nder Michigan law, 'voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation, and before a reasonable time has passed for the blood to cool and reason to resume its habitual control.'" *Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002) (quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)). In other words, "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690.

Here, as the Michigan Court of Appeals explained, a rational view of the evidence would not have supported a verdict of either second degree murder or voluntary manslaughter. Petitioner's defense at trial was simply that he was not the perpetrator. All of the evidence established that, whoever the perpetrator was, the murder was committed during the commission of two felonies–armed robbery and home invasion. Because the evidence showed that the killing occurred during the commission of a felony, and because petitioner "did not dispute the evidence, but whether

18

he was the perpetrator, . . . the only rational view of the evidence was that the victim's shooter did so during a first-degree home invasion and robbery, so that the lesser-included offense of second-degree murder was not required." *Times*, 2008 WL 2038028, at *2. Further, there was also no evidence presented that the perpetrator acted under the influence of passion caused by an adequate provocation, and thus "no rational view of the evidence supported a manslaughter instruction." *Id*. Because petitioner's jury instruction claim is not cognizable on habeas review, and because in any event petitioner was not entitled to a lesser offense instruction under state law, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[3]

F.    *Felony Murder Conviction (Claim II)*

In his second claim, petitioner contends that he was wrongfully convicted of first degree felony murder. In asserting this claim, petitioner argues both that the prosecutor wrongfully charged him with first degree murder, and that the evidence was insufficient to support his conviction.

1.    *Overcharging*

To the extent petitioner contends he was wrongfully charged with first degree murder, the Court should reject his claim. A prosecutor has broad discretion in deciding what charges to pursue, and the prosecutor's charging decisions are generally not subject to review by the courts. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Here, the

---

[3]In his reply, petitioner contends that his claim is really that the trial judge knowingly and intentionally misled the jury in his reading of the jury instructions. Petitioner does not, however, identify any specific error in the jury instructions. The court's instructions set forth each of the elements of first degree felony murder, including the elements of the underlying felonies and the principle of transferred intent. *See* Trial Tr., Vol. VI, at 69-71. There is nothing inherently misleading or confusing in this instruction, and petitioner does not identify any particular portion of the instruction that was improper.

prosecutor had more than sufficient probable cause to believe that petitioner committed felony murder.  The testimony of the witnesses identified petitioner as the perpetrator and established that the killing occurred during the commission of both an armed robbery and a home invasion.  Thus, petitioner is not entitled to habeas relief on this claim.

 2. *Sufficiency of the Evidence*

*a.  Legal Standard*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam).  The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).  Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated

20

a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065.

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16). Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. Second degree murder consists of four elements: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without lawful justification or excuse. *See People v. Smith*, 478 Mich. 64, 70, 731 N.W.2d 411, 414-15 (2007) (citing *People v. Goecke*, 457 Mich. 442, 464, 579 N.W.2d 868 (1998)). "Some evidence must be presented regarding each element of the crime or from which those elements may be inferred." *People v. Goecke*, 457 Mich. 442, 470, 579 N.W.2d 868 (1998) (citing *People v. Doss*, 406 Mich. 90, 100-01, 276 N.W.2d 9 (1979)). In order to show malice, the prosecution must establish one of three mental states on the part of the defendant at the time of the

killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). The prosecution may establish the elements of a crime through circumstantial evidence that creates a reasonable inference that an element is satisfied. *See Kelly v. Jackson*, 353 F. Supp.2d. 887, 891 (E.D. Mich. 2005) (citing *People. v. Goecke*, 457 Mich. 442, 463-64, 579 N.W.2d 868 (1998)). As the Supreme Court has explained:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland v. United States*, 348 U.S. 121, 140 (1954).

Second degree murder is elevated to first degree murder by the showing of some additional element. Relevant here, first degree murder is a second degree murder "committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b).

### b. Analysis

Here, the prosecution presented sufficient evidence to prove beyond a reasonable doubt that petitioner committed felony murder. The victims identified petitioner as the perpetrator, and testified that he entered their occupied home and robbed them. They also testified that petitioner

shot the victim as he was attempting to flee the scene.  Further, the evidence was sufficient to establish that petitioner acted with malice sufficient to sustain his conviction for murder.  The evidence showed that petitioner deliberately fired his gun at Matthews, an act from which the jury could infer that petitioner intended to kill Matthews, commit great bodily harm, or create a high risk of death or great bodily harm.  *See People v. Fields*, No. 266738, 2007 WL 1712619, at *1 (Mich. Ct. App. June 14, 2007) ("Shooting a gun at a person at such close range clearly indicates an obvious disregard of life-endangering consequences."); *People v. Williams*, No. 232827, 2004 WL 2124705, at *5 (Mich. Ct. App. Sept. 23, 2004) ("Here, defendant concedes that there was evidence that he fired at a door.  Also, there was evidence that someone had just come to answer the door, that defendant knew that someone had done so, and, in fact, defendant had yelled for the person to get back before firing the shot at the door.  Because the natural tendency of firing a gun at a door behind which someone is standing is to cause death or great bodily harm, there was evidence from which a rational factfinder could find beyond a reasonable doubt that defendant acted with malice.").

Petitioner argues that the evidence was insufficient because he robbed Narvaiz inside the apartment, but did not commit any felony with respect to Matthews.  The shooting occurred when he fired at Matthews, not Narvaiz.  Thus, there was no link between the felony and the murder.  Further, petitioner argues, because he was acquitted of the charge of assault with intent to kill Matthews, the jury could not have also found that he acted with malice.  These arguments are unavailing.  First, even if true, it does not matter that Matthews, the person at whom petitioner was shooting, was not the victim of the underlying robbery.  The felony murder statute defines as first degree murder any murder committed during the commission of an enumerated felony.  It does not require that the victim of the murder also be the victim of the underlying felony.  *See People v.*

23

*Graves*, 52 Mich. App. 326, 330, 217 N.W.2d 78, 81 (1974) ("The law is well settled that the victim of the felony need not be the one who is murdered."). Further, "[m]urder committed while attempting to escape from the scene of a felony is felony murder if it is immediately connected with the underlying felony." *Terry v. Bock*, 208 F. Supp. 2d 780, 795 (E.D. Mich. 2002) (Gadola, J.), a*ff'd*, 79 Fed. Appx. 128 (6th Cir. 2003).

Second, at whom petitioner was shooting is likewise irrelevant. "The principle of 'transferred intent' makes an actor criminally responsible for the results of his conduct, even though the person injured is not his intended victim." *State ex rel S.B.*, 755 A.2d 596, 599 (N.J. Super. Ct. App. Div. 2000); *accord* 1 LaFave & Scott, Substantive Criminal Law § 6.4(d) (2d ed.). Michigan courts apply the common law doctrine of transferred intent. *See People v. Lawton*, 196 Mich. App. 341, 350-51, 492 N.W.2d 810, 815 (1992); *People v. Youngblood*, 165 Mich. App. 381, 388, 418 N.W.2d 472, 475 (1988). As explained by the Michigan Court of Appeals in a case involving a charge of assault with intent to commit great bodily harm, "[b]efore defendant can be convicted it must first be shown that he had the intention to cause great bodily harm to someone. Merely because he shot the wrong person makes his crime no less heinous. It is only necessary that the state of mind exist, not that it be directed at a particular person." *People v. Lovett*, 90 Mich. App. 169, 172, 283 N.W.2d 357, 359 (1979). In other words, it does not matter with respect to whom petitioner acted with malice aforethought. So long as he acted with that mental state as to someone, the requisite mental state for murder is established, even if he ultimately killed someone who was not his initial target. *See Lawton*, 196 Mich. App. at 350-51, 492 N.W.2d at 815; *Youngblood*, 165 Mich. App. at 388, 418 N.W.2d at 475. Even if the evidence establishes only that petitioner intended to kill or commit great bodily harm as to Matthews, this is sufficient to establish

24

malice for his murder of Narvaiz under the doctrine of transferred intent.[4]

Finally, the fact that the jury acquitted petitioner of assault with intent to commit murder with respect to Matthews does not negate the sufficiency of the evidence with respect to petitioner's murder conviction. Even if the verdict is inconsistent, this would not provide a basis for habeas relief. In *Dunn v. United States*, 284 U.S. 390 (1932), the Court held that "[c]onsistency in the verdict is not necessary," because "[e]ach count in an indictment is regarded as if it was a separate indictment." *Id.* at 393. In *Harris v. Rivera*, 454 U.S. 339 (1981), the Court likewise explained that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside. We have so held with respect to inconsistency between verdicts on separate charges against one defendant, and also with respect to verdicts that treat codefendants in a joint trial inconsistently." *Id.* at 345 (citations and footnote omitted). The Court again explained the rationale for this rule in *United States v. Powell*, 469 U.S. 57 (1984):

> As the *Dunn* Court noted, where truly inconsistent verdicts have been reached, "[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Dunn, supra*, 284 U.S., at 393, 52 S.Ct., at 190. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts-even verdicts that acquit on a predicate offense while convicting on the compound offense-should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.
>
> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred,

---

[4]The jury was specifically instructed on transferred intent. *See* Trial Tr., Vol. VI, at 71.

> but it is unclear whose ox has been gored. Given this uncertainty, and the fact that
> the Government is precluded from challenging the acquittal, it is hardly satisfactory
> to allow the defendant to receive a new trial on the conviction as a matter of course.
> *Harris v. Rivera*, *supra*, indicates that nothing in the Constitution would require such
> a protection[.]

*Id*. at 64-65 (citations omitted); *see also*, *United States v. Chilingirian*, 280 F.3d 704, 710-11 (6th

Cir. 2002). Thus, the rendering of an inconsistent verdict, if such occurred in petitioner's case, does

not amount to a constitutional violation, and petitioner therefore is not entitled to habeas relief on

this claim.

Moreover, petitioner cannot show any inconsistency between his acquittal on the assault

charge related to Matthews and his conviction of felony murder. To establish the assault charge, the

prosecution was required to prove that petitioner possessed the specific intent to kill Matthews (or

to commit great bodily harm on Matthews on the lesser offense of assault with intent to commit

great bodily harm). *See Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (quoting *People v.*

*Plummer*, 229 Mich. App. 293, 581 N.W.2d 753, 759 (1998); *People v. Hoffman*, 225 Mich. App.

103, 570 N.W.2d 146, 150 (1997)) (elements of assault with intent to commit murder include "an

actual intent to kill."). Either of these showings–an intent to kill or an intent to commit great bodily

harm–also would have sufficed to establish the malice element of the crime of murder. The absence

of these showings, however, does not preclude a finding of malice, because as explained above

malice can also be established by an intent to create a very high risk of death or great bodily harm

with the knowledge that death or great bodily harm is the probable result. *See Dykhouse*, 418 Mich.

at 495, 345 N.W.2d at 151; *Aaron*, 409 Mich. at 713-14, 299 N.W.2d at 319-20. Thus, with no

inconsistency, the jury could have concluded that petitioner did not actually intend to kill or commit

great bodily harm against Matthews, but that he did intend to create a very high risk of death or great

bodily harm.

In short, in light of the testimony of the victims identifying petitioner as the perpetrator and establishing that he fired the gun at Matthews in an attempt to flee the scene of his underlying felonies, the jury's verdict was not "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Double Jeopardy (Claim III)*

Petitioner next contends that his convictions violate his right not to be subject to double jeopardy. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Legal Standard*

The Fifth Amendment to the United States Constitution commands that no "person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Double Jeopardy Clause, which is applicable to the states through the Due Process Clause of the Fourteenth Amendment, *see Benton v. Maryland*, 395 U.S. 784, 794 (1969), provides three basic protections: "[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnotes omitted). "These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense." *Shiro v. Farley*, 510 U.S. 222, 229 (1994) (citing *United States v. Wilson*, 420 U.S. 332, 339 (1975)).

However, in the context of multiple punishments, the Double Jeopardy Clause does not prohibit a state from defining one act of conduct to constitute two separate criminal offenses. As

27

the Supreme Court has explained, "[b]ecause the substantive power to prescribe crimes and determine punishments is vested with the legislature . . ., the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984). Thus, "even if the two statutes proscribe the same conduct, the Double Jeopardy Clause does not prevent the imposition of cumulative punishments if the state legislature clearly intends to impose them." *Brimmage v. Sumner*, 793 F.2d 1014, 1015 (9th Cir. 1986). As the Supreme Court explained, when "a legislature specifically authorizes cumulative punishments under two statutes, . . . a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983). In determining whether the Michigan legislature intended to authorize separate, cumulative punishments in the circumstances present here, the Court "must accept the state court's interpretation of the legislative intent for the imposition of multiple punishments[.]" *Brimmage*, 793 F.2d at 1015; *see also*, *Hunter*, 459 U.S. at 368. Thus, the question is whether the Michigan Legislature intended that convictions for felony murder and the underlying predicate felony gives rise to separate criminal liability; if so, the "court's inquiry is at an end" and there is no double jeopardy violation. *Johnson*, 467 U.S at 499 n.8. In making this determination, the Court is bound by the Michigan courts' interpretation of state law. *See Rodgers v. Bock*, 49 Fed. Appx. 596, 597 (6th Cir. 2002); *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989).

Where the legislative intent is not clear, the Court must apply the *Blockburger* "same elements" test to determine whether multiple prosecutions or punishments violate the Double Jeopardy Clause. Under this test:

> In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or

28

tried cannot survive the "same-elements" test, the double jeopardy bar applies. The same-elements test, sometimes referred to as the "*Blockburger*" test, inquires whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution.

*United States v. Dixon*, 509 U.S. 688, 696 (1993) (citations omitted); *see also*, *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

2.    *Analysis*

Petitioner contends that his double jeopardy rights were violated in two respects. First, he contends that it violated double jeopardy for him to be tried and convicted of both home invasion and armed robbery. Second, he contends that because he only discharged the firearm once, with one intent, he could not simultaneously be charged with the assault of Matthews and the murder of Narvaiz. These claims are without merit.

With respect to the armed robbery and home invasion convictions, each of these charges contains an element that the other does not, and thus they constitute separate offenses for which petitioner could be convicted under the Double Jeopardy Clause. The elements of armed robbery are: (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. *See Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004) (Gadola, J.), *aff'd*, 173 Fed. Appx. 437 (6th Cir. 2006); *People v. Smith*, 478 Mich. 292, 319, 733 N.W.2d 351, 365 (2007). Under Michigan law, "[t]he elements of first-degree home invasion are: (1) the defendant broke into and entered a dwelling without permission, (2) while intending to commit or actually committing a felony, larceny, or assault while entering, exiting, or present within the dwelling, and (3) another person was lawfully present in the dwelling or the defendant was armed with a dangerous weapon." *People v. Johnson*, No. 285172,

29

2009 WL 2974771, at *1 (Mich. Ct. App. Sept. 17, 2009) (per curiam); *see also*, MICH. COMP. LAWS § 750.110a(2). Each of these offenses contains elements that the other does not. Armed robbery requires an assault, a felonious taking of property, and that the perpetrator be armed, while the home invasion statute requires none of these elements. Conversely, home invasion requires the breaking and entering of a dwelling with the intent to commit a felony, while the home is occupied, and the armed robbery statute requires none of these elements. Further, the Michigan legislature has clearly expressed its intent that multiple punishments be imposed in this context, providing in the home invasion statute that "[i]mposition of a penalty under this section does not bar imposition of a penalty under any other applicable law." MICH. COMP. LAWS § 750.110a(9). Thus, armed robbery and home invasion constitute separate offenses, and petitioner's multiple convictions on these offenses does not violate the Double Jeopardy Clause.

Petitioner also contends that he could not be charged with both assaulting Matthews and murdering Narvaiz, because the two crimes arose out of a single act of firing the gun once, and resulted from a single intent directed toward Matthews. This argument fails, for two reasons. Petitioner, in essence, contends that his single act and his single intent are discrete elements which can be used only once to support a single conviction. Nothing in Michigan statutory law or the Double Jeopardy Clause requires such a conclusion. Rather, as the Connecticut Supreme Court has explained, "[a]lthough th[e] traditional formulation of the [transferred intent] doctrine requires that the intent be transferred, such intent is not regarded as a limited commodity that, once satisfied, is totally expended." *State v. Hinton*, 630 A.2d 593, 596 n.2 (Conn. 1993). As the court went on to note, "[h]uman beings are not fungible. Therefore, a separate injury to each constitutes a separate crime, and the law does not give the defendant a discount on the second and subsequent victims of

30

his intentional conduct." *Id.* at 598. Courts from other jurisdictions have reached the same conclusion, finding no constitutional or statutory problem with multiple convictions arising from a single intent. *See State v. Henley*, 687 P.2d 1220, 1222 (Ariz. 1984) ("When the act of firing one bullet results in two persons being injured, the person firing the bullet is responsible for two separate and distinct injuries and therefore has committed two assaults. This is so even though he has only committed one act and may only have had one 'original' intent."); *Commonwealth v. Melton*, 763 N.E.2d 1092, 1097-98 (Mass. 2002) (citing cases); *State v. Worlock*, 569 A.2d 1314, 1325 (N.J. 1990); *State v. Christian*, 526 S.E.2d 568, 572 (N.C. Ct. App. 2002).

More importantly, the Michigan Court of Appeals has directly answered this question. In *People v. Lovett*, 90 Mich. App. 169, 172, 283 N.W.2d 357, 359 (1979), the defendant was convicted (pursuant to his plea) of two counts of assault with intent to commit great bodily harm. The defendant shot at one victim intending to harm him, but struck an unintended victim who was standing across the street. *See Lovett*, 90 Mich. App. at 171, 283 N.W.2d at 358. After concluding that the defendant could properly be convicted of assault with intent to commit great bodily harm with respect to the unintended victim, *see id.* at 171-72, 283 N.W.2d at 358-59, the court of appeals considered the defendant's argument that he could not "be convicted of two counts of assault since he only did a single act with specific intent to injure one person." *Id.* at 172, 283 N.W.2d at 359. The court rejected this argument, reasoning that "a person, by a single act, can violate more than one criminal statute and thus be found guilty of multiple offenses." *Id.* at 174, 283 N.W.2d at 359. The court continued that "[w]here crimes against persons are involved we believe a separate interest of society has been invaded with each victim and that, therefore, where two persons are assaulted, there are two separate offenses." *Id.*, 283 N.W.2d at 360. The court concluded that "the result is not

31

altered" even though "the doctrine of transferred intent is involved in this case." *Id.* In short, the Michigan Court of Appeals has interpreted state law as authorizing multiple criminal punishment for separate assaults accompanied by an intent to harm only a single victim where the doctrine of transferred intent supplies the necessary mental state element for the unintended assault. Because this Court is bound by the Michigan courts' interpretation of state law in deciding the double jeopardy issue, *see Rodgers*, 49 Fed. Appx. at 597; *Banner*, 886 F.2d at 780, the "court's inquiry is at an end" and there is no double jeopardy violation. *Johnson*, 467 U.S. at 499 n.8.

Second, even if there would otherwise be a double jeopardy violation by multiple convictions in these circumstances, petitioner was not convicted of the assault offense relating to Matthews. Petitioner was not prosecuted a second time following an acquittal or a conviction, nor was he punished multiple times for the same offense. Even assuming that the assault and murder charges against petitioner would have constituted the same offense for double jeopardy purposes, the mere charging of multiple counts in a single information does not raise double jeopardy concerns. As aptly explained by the Second Circuit:

> Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed. It is well established that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion," and "a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution...." *United States v. Batchelder*, 442 U.S. 114, 124, (1979). Where two statutory sections operate independently of one another, "there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes." *Ball v. United States*, 470 U.S. 856, 860 (1985); *see Batchelder*, 442 U.S. at 11. In such circumstances, "the Double Jeopardy Clause imposes no prohibition to simultaneous prosecutions." *Ball*, 470 U.S. at 860 n. 7. Even where the Double Jeopardy Clause would bar cumulative punishment for more than one such offense, "the Clause does not prohibit the State from prosecuting [the defendant] for such multiple offenses in a single prosecution." *Ohio v. Johnson*, 467 U.S. 493, 500 (1984); *see, e.g., Ball*, 470 U.S. at 860 n. 8 (" 'there can be no impropriety ... for a

32

prosecutor to file an information containing counts charging violations of several different provisions of the federal bank robbery statute where there is evidence to support the charges, even though the defendant could not in the end stand convicted of both offenses" (quoting *United States v. Gaddis*, 424 U.S. 544, 550 (1976))).

Accordingly, "[i]f, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense." *Ball*, 470 U.S. at 865. If the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment.

*United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (parallel citations omitted); *see also*, *McCloud v. Deppish*, 409 F.3d 869, 873 n.3 (7th Cir. 2005). Thus, even if the counts against petitioner were multiplicitous under the Double Jeopardy Clause, because he faced only a single prosecution and was convicted only of one of the offenses, there was no double jeopardy violation. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.     *Ineffective Assistance of Counsel (Claim IV)*

Finally, petitioner contends that his trial and appellate attorneys were constitutionally ineffective. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Legal Standard*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an

33

ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with

34

> the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

With respect to appellate counsel, it is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id*. As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'" *Id*. (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See id*. at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

2.     *Analysis*

Petitioner contends that both his trial and appellate attorneys were ineffective for failing to challenge the prosecutor's overcharging decision, the double jeopardy violation, and the failure to give a manslaughter instruction. With respect to the latter, trial counsel requested a manslaughter instruction, and appellate counsel raised this issue on direct appeal. Thus, neither counsel's performance was deficient. Further, as explained above, the Michigan Court of Appeals determined

that petitioner was not entitled to a manslaughter instruction as a matter of state law. Counsel cannot be deemed ineffective for failing to request an instruction which was not appropriate under state law. *See Mitzel v. Tate*, 267 F.3d 524, 538 (6th Cir. 2001). With respect to the other claims, as explained above petitioner's overcharging and double jeopardy claims are without merit. Thus, petitioner cannot show that trial counsel was ineffective for failing to raise these objections at trial, or that appellate counsel was ineffective for failing to raise these claims on appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

I.      *Recommendation Regarding Certificate of Appealability*

    1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial

36

showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  As

explained above, it is clear that a trial court's failure to give a lesser offense instruction is not cognizable on habeas review, and in any event petitioner was not entitled to a second degree murder or manslaughter instruction under state law. Thus, the resolution of petitioner's jury instruction claim is not reasonably debatable. Because there was abundant evidence to support petitioner's convictions, and because the prosecutor's charging discretion is not subject to judicial review, the resolution of petitioner's second habeas claim is not reasonably debatable. Further, it is clear, as explained above, that armed robbery and home invasion constitute separate offenses for double jeopardy purposes, and that a single intent and act can support separate convictions relating to multiple victims. Thus, the resolution of petitioner's double jeopardy claim is not reasonably debatable. Finally, because the resolution of petitioner's underlying claims is not reasonably debatable, it follows that the resolution of his related ineffective assistance of counsel claims is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

J.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's first claim did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. The Court should also conclude that petitioner's remaining claims are barred by his procedural default in the state courts, and alternatively that the claims are without merit. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation,

but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J .Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 9/16/13

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on September 16, 2013.

s/Eddrey Butts
Case Manager

39